IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO

Civil Action No. 17-cv-01968-REB-MEH

EFFLEY N. BROOKS,

      Plaintiff,

v.

DENVER PUBLIC SCHOOLS,
ALLEN SMITH,
ANNIE LARKIN,
EMILY HOLMES,
ERICA KOUZMANOFF-VYMYSLICKY,
EMILY GOERS, and
NATALIE JACOBSEN,

      Defendants.

---

## RECOMMENDATION OF UNITED STATES MAGISTRATE JUDGE

---

**Michael E. Hegarty, United States Magistrate Judge**.

      Defendants seek to dismiss Plaintiff Effley N. Brook's Complaint in part.  According to

Defendants, the Court should dismiss each of Mr. Brooks' claims, except his Title VII claim against

Denver Public Schools ("DPS") and his equal protection claim against Allen Smith.  The Honorable

Robert E. Blackburn referred Defendants' motion to this Court for recommendation.  The Court first

holds that Mr. Brooks does not plead a policy or custom underlying his 42 U.S.C. § 1981 claim

against DPS.  Next, the Court holds that Mr. Brooks fails to state a retaliation claim under Title VII.

The Court then finds that Mr. Brooks did not exhaust the administrative remedies for his Colorado

Anti-Discrimination Act ("CADA") claim.  Fourth, Mr. Brooks' First Amendment retaliation claim

fails, because he did not speak on a matter of public concern.  Fifth, the Court holds that Mr. Brooks

does not state an Equal Protection Clause violation.  Finally, Mr. Brooks does not allege a meeting

of the minds underlying his civil conspiracy claim. As such, the Court recommends granting Defendants' Partial Motion to Dismiss Complaint.

## BACKGROUND

**I.     Facts**

The following are factual allegations (as opposed to legal conclusions, bare assertions, or merely conclusory allegations) made by Mr. Brooks in the Complaint, which the Court takes as true for analysis under Fed. R. Civ. P. 12(b)(6). *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Mr. Brooks began working for DPS on April 4, 2016 as the manager of training and employee development. Compl. ¶ 16, ECF No. 3. In September 2016 Mr. Brooks attended a retreat that was designed to foster dialog about how different teams within DPS work together. *Id.* ¶ 17. Defendants Larkin, Holmes, Kouzmanoff-Vymyslicky, Goers, and Jacobsen (collectively the "Carson Defendants"), who are all employed at Carson Elementary School, also participated in the retreat. *Id.* ¶¶ 6–10, 28–29.

On December 1, 2016, after the scheduled activities for the day were completed, some employees participated in an event called "fun night." *Id.* ¶ 24. During this evening activity, employees consumed alcohol and played games, such as "Cards Against Humanity."[1] *Id.* ¶¶ 25–34. At the beginning of the night, Mr. Brooks took shots of tequila with a fellow employee and joked with a female colleague about participating in a "birthday spank line." *Id.* ¶¶ 24–26. After Mr. Brooks played "Cards Against Humanity," he participated in an drinking game with the Carson Defendants, who were at the ping pong table. *Id.* ¶¶ 27–28. Mr. Brooks told the Carson Defendants

---

[1] "Cards Against Humanity" is played using cards with various potentially offensive statements. *Id.* at 25–34.

he had an inappropriate joke to share, called the "leprechaun joke," and the Carson Defendants stated that they wanted to hear it. *Id.* ¶¶ 29–30. After Mr. Brooks told the joke, some of the Carson Defendants walked away from the ping pong table. *Id.* ¶ 31. Mr. Brooks asked Ms. Kouzmanoff-Vymyslicky if the Carson Defendants were offended, and she replied, "Maybe you should have said that it was really graphic." *Id.* The Carson Defendants left the fun night approximately ten minutes later. *Id.* ¶ 32. At 10:30 p.m., Patricia Hurrieta, the executive director of the Culture Equity Leadership Team ("CELT"), sent Mr. Brooks a text message informing him that the team leads plan to meet at 6:45 a.m. the next day. *Id.* ¶ 33. Mr. Brooks continued to play "Cards Against Humanity" until 10:45 p.m. when he went to his room. *Id.*

The next morning, Mr. Brooks met with Ms. Hurrieta and Jeff Wein, the DPS project lead of the CELT. *Id.* ¶ 34. The parties discussed the Carson Defendants' allegations that Mr. Brooks shared confidential information. *Id.* ¶ 34. Further, Ms. Hurrieta and Mr. Wein told Mr. Brooks that he cannot be trusted and that they do not feel comfortable around him. *Id.* ¶ 35. They then asked Mr. Brooks to write a statement detailing what happened at the fun night. *Id.* ¶¶ 35–36. After Mr. Brooks spoke with individuals from human resources, DPS placed him on paid administrative leave. *Id.* ¶ 36.

On December 6, 2016, Mr. Brooks met with Stacey Dvergsdal (the director of the CELT), Mr. Smith (the associate chief of the CELT), and Ms. Hurrieta. *Id.* ¶ 37. Mr. Smith informed Mr. Brooks they were concerned about sexual harassment. *Id.* Mr. Brooks replied that the leprechaun joke does not constitute sexual harassment or a terminable offense. *Id.* ¶ 38. Ms. Hurrieta then told Mr. Brooks, "We don't know what you might do if you come back." *Id.* At this point, Mr. Smith discussed Mr. Brooks' excessive drinking and other conversations Mr. Brooks had at the fun night.

*Id.* ¶ 39.  Mr. Brooks then explained how other employees engaged in inappropriate conduct, and he stated that being singled out is the "very thing we're working to address with the African-American Task Force, different standards for different people." *Id.* ¶¶ 40–42.  Mr. Smith told Mr. Brooks not to mention the African-American Task Force, and he ended the meeting. *Id.* ¶ 42.

Later that evening, Christin Sahm-McKe, DPS' human resources representative, contacted Mr. Brooks to inform him that DPS reached a decision for corrective action. *Id.* ¶ 43.  Ms. Sahm-McKe and Mr. Brooks scheduled a meeting for December 15, 2016 to discuss the decision. *Id.*  At that meeting, Mr. Smith and Ms. Sahm-McKe presented Mr. Brooks with a draft termination letter and a settlement agreement to consider as an alternative to termination. *Id.* ¶¶ 44–45.  Mr. Brooks informed Mr. Smith and Ms. Sahm-McKe that he would not sign the settlement agreement, "since it is clear he is 'being singled out as a stereotypical crass black man, held to a different standard than the non-African American attendees at the retreat.'" *Id.* ¶ 46.  According to Mr. Brooks, he was the only employee disciplined for behavior at the fun night even though other individuals engaged in unprofessional conduct. *Id.* ¶ 47.

DPS formally terminated Mr. Brooks on January 7, 2017. *Id.* ¶ 51.  Mr. Brooks subsequently requested a post-termination hearing, which took place on February 3, 2017. *Id.* ¶¶ 52–53.  Along with Mr. Brooks, Mr. Smith, Ms. Sahm-McKe, and a hearing officer were present at the hearing. *Id.* ¶ 53.  Mr. Brooks first explained what happened at the fun night, and Mr. Smith gave additional reasons for Mr. Brooks' termination. *Id.* ¶¶ 54–59.  Mr. Brooks then complained that DPS holds its African-American employees to different standards than its non-minority employees. *Id.* ¶ 61.  After Mr. Smith stated that he heard Mr. Brooks tell the leprechaun joke at the retreat, the officer ended

the hearing. *Id.* ¶ 62. On February 8, 2017, the hearing officer upheld Mr. Brooks' termination.[2]

*Id.* ¶ 63. Mr. Brooks filed a charge of discrimination with the Equal Employment Opportunity

Commission ("EEOC") on May 16, 2017. *Id.* ¶ 49. The EEOC issued a notice of right to sue on

June 6, 2017. *Id.*

## II.     Procedural History

Based on these factual allegations, Mr. Brooks filed his Complaint in state court on July 19,

2017. ECF No. 3. Mr. Brooks asserts seven causes of action: (1) race discrimination in violation

of Title VII against DPS; (2) race discrimination in violation of 42 U.S.C. § 1981 against DPS;[3] (3)

Title VII retaliation against DPS; (4) violation of the CADA against DPS; (5) First Amendment

retaliation against DPS, Mr. Smith, and the Carson Defendants;[4] (6) equal protection violations

against all Defendants; and (7) conspiracy against Mr. Smith and the Carson Defendants. Compl.

¶¶ 64–113. Defendants removed the case to this Court on August 15, 2017. Notice of Removal,

ECF No. 1.

Defendants responded to the Complaint by filing an Answer, ECF No. 17, and the present

Partial Motion to Dismiss Complaint, ECF No. 18. Defendants argue that, with the exception of the

Title VII discrimination claim and the equal protection claim against Mr. Smith, the Court should

---

[2] Mr. Brooks alleges the hearing officer upheld the termination on January 8, 2017. Compl.
¶ 63. However, given that the hearing did not take place until February 3, 2017, the Court believes
this to be a typographical error.

[3] Mr. Brooks' first and second claims both assert violations of § 1981 and Title VII. *See*
Compl. ¶¶ 64–77. However, Mr. Brooks clarifies in his response that he intends to plead only a
violation of Title VII in his first claim, and he intends his second claim to assert only a § 1981
violation. Resp. to Mot. to Dismiss 7, ECF No. 23. The Court will construe Mr. Brooks' claims
accordingly.

[4] Although Mr. Brooks labels this as his fourth claim for relief, it is actually his fifth claim.
Additionally, Mr. Brooks' "fifth" and "sixth" causes of action are in fact his sixth and seven claims.

dismiss Mr. Brooks' Complaint. Mot. to Dismiss 5–15. Mr. Brooks filed a response brief on September 28, 2017, Resp. to Mot. to Dismiss, ECF No. 23, and Defendants replied on October 18, 2017. Reply in Supp. of Mot. to Dismiss, ECF No. 27.

## LEGAL STANDARDS

"To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Iqbal*, 556 U.S. at 678 (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). Plausibility, in the context of a motion to dismiss, means that the plaintiff pleaded facts which allow "the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id. Twombly* requires a two-prong analysis. First, a court must identify "the allegations in the complaint that are not entitled to the assumption of truth," that is, those allegations which are legal conclusions, bare assertions, or merely conclusory. *Id.* at 678–80. Second, the Court must consider the factual allegations "to determine if they plausibly suggest an entitlement to relief." *Id.* at 681. If the allegations state a plausible claim for relief, such claim survives the motion to dismiss. *Id.* at 680.

Plausibility refers "to the scope of the allegations in a complaint: if they are so general that they encompass a wide swath of conduct, much of it innocent, then the plaintiffs 'have not nudged their claims across the line from conceivable to plausible.'" *Khalik v. United Air Lines*, 671 F.3d 1188, 1191 (10th Cir. 2012) (quoting *Robbins v. Oklahoma*, 519 F.3d 1242, 1247 (10th Cir. 2008)). "The nature and specificity of the allegations required to state a plausible claim will vary based on context." *Kan. Penn Gaming, LLC v. Collins*, 656 F.3d 1210, 1215 (10th Cir. 2011). Thus, while the Rule 12(b)(6) standard does not require that a plaintiff establish a prima facie case in a complaint, the elements of each alleged cause of action may help to determine whether the plaintiff

has set forth a plausible claim. *Khalik*, 671 F.3d at 1191.

However, "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Iqbal*, 556 U.S. at 678. The complaint must provide "more than labels and conclusions" or merely "a formulaic recitation of the elements of a cause of action," so that "courts 'are not bound to accept as true a legal conclusion couched as a factual allegation.'" *Twombly*, 550 U.S. at 555 (quoting *Papasan v. Allain*, 478 U.S. 265, 286 (1986)). "Determining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. "[W]here the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct," the complaint has made an allegation, "but it has not shown that the pleader is entitled to relief." *Id.* (quotation marks and citation omitted).

## ANALYSIS

### I. Second Cause of Action: Violation of 42 U.S.C. § 1981

Mr. Brooks' second claim asserts DPS discriminated against him based on his race in violation of 42 U.S.C. § 1981. Compl. ¶¶ 64–70. Defendants contend Mr. Brooks fails to state a claim, because he does not allege DPS had a policy or custom of unlawful discrimination.[5] Mot. to

---

[5] Defendants also contend the Court should dismiss this claim, because Mr. Brooks does not plead it under 42 U.S.C. § 1981 and 42 U.S.C. § 1983. Mot. to Dismiss 5–6. Defendants are correct that under current Supreme Court precedent, a plaintiff must assert a § 1981 claim for damages under § 1983 when the claim is against a state actor. *Jett v. Dallas Indep. Sch. Dist.*, 491 U.S. 701, 735–36 (1989). However, Mr. Brooks' failure to allege that he also brings his claim under § 1983 is generally the type of error for which the Court would grant Mr. Brooks leave to amend. *See Bolden v. City of Topeka, Kan.*, 441 F.3d 1129, 1137 (10th Cir. 2006) ("[E]ven if [the plaintiff] had not been sufficiently clear about bringing the § 1981 claim under § 1983, the district court should have permitted him to amend his complaint to do so."). "Of course, if [Mr. Brooks'] § 1981 claim against [DPS] rest[s] solely on an allegation of respondeat superior, then it [will] fail even if pleaded properly under § 1983." *Id.* Therefore, the Court must analyze whether Mr. Brooks alleges a policy

7

Dismiss 6–8, ECF No. 18.  Mr. Brooks responds that DPS had a policy or custom of regularly "consuming alcohol and otherwise engaging in frivolous conversation."  Resp. to Mot. to Dismiss 7, ECF No. 23.

Section 1981 grants "all persons within the jurisdiction of the United States . . . the same right . . . to make and enforce contracts."  42 U.S.C. § 1981.  Therefore, it "prohibits not only racial discrimination [in the workplace] but also retaliation against those who oppose [discrimination]." *Hannah v. Cowlishaw*, 628 F. App'x 629, 631–32 (10th Cir. 2016) (quoting *Univ. of Tex. Sw. Med. Ctr. v. Nassar*, – U.S. – , 133 S. Ct. 2517, 2529 (2013)) (alterations in original).  To assert a violation of § 1981 against a municipality, a plaintiff must establish entity liability under § 1983 in addition to pleading race discrimination.  *Jett*, 491 U.S. at 735; *Bolden*, 441 F.3d at 1137 (holding that the 1991 amendments to § 1981 did not overrule *Jett*).  Municipal liability under § 1983 requires the existence of an official policy or custom, a direct causal link between the policy or custom and the constitutional injury, and a showing that the defendant established the policy with deliberate indifference to an almost inevitable constitutional injury.  *Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 767–69 (10th Cir. 2013).  To establish an official policy or custom, a plaintiff may point to: (1) a formal regulation or policy, (2) an informal custom that is so widespread it amounts to a custom or usage with the force of law, (3) a decision of an employee with final policymaking authority, (4) final policymakers' ratification of their subordinates' decisions, or (5) a failure to adequately train or supervise employees.  *See, e.g.*, *Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010).

Here, the Court finds that Mr. Brooks fails to plead an official policy or custom that caused

_____

or custom underlying his § 1981 claim.

his constitutional injuries. The only theory of municipal liability Mr. Brooks advances is a widespread informal custom. According to Mr. Brooks, DPS had a widespread practice of permitting employees to play inappropriate games and engage in other frivolous behavior at the retreat. Resp. to Mot. to Dismiss 7–8. However, even if DPS had such an informal custom, Mr. Brooks overlooks that this "policy or custom" did not cause the constitutional deprivation he alleges.[6] *See City of Oklahoma City v. Tuttle*, 471 U.S. 808, 828 (1985) (stating that a plaintiff must show the "policy or custom of the [municipality] 'subjected' him, or 'caused him to be subjected' to the deprivation of constitutional rights"). Indeed, that DPS regularly permitted its employees to play "Cards Against Humanity" did not cause DPS to unlawfully terminate Mr. Brooks. Because it is Mr. Brooks' burden to establish a policy or custom, and he does not allege any other basis for entity liability, the Court could dismiss his claim without further analysis. *See id.* at 830 (stating that the plaintiff bears the burden of establishing "the existence of a particular official municipal policy or establish custom"). However, because Mr. Brooks broadly alleges that DPS terminated him in a discriminatory manner, the Court will address whether Mr. Brooks pleads facts showing that a final policymaker executed the discriminatory termination.

The Court finds that Mr. Brooks has not made such a showing for two reasons: (1) Mr. Smith, Ms. Sahm-McKe, and the hearing officer—the individuals Mr. Brooks alleges illegally terminated his employment—are not final policymakers for DPS and (2) Mr. Brooks does not allege

---

[6] Although Mr. Brooks alleges that DPS established the African-American Task Force to address different standards for different people, Compl. ¶ 42, this is insufficient to demonstrate DPS consistently treated minorities differently. "Indeed, a plaintiff's 'failure to allege the existence of similar discrimination as to others seriously undermines her claim that the City maintained a custom of discriminatory personnel practices.'" *Carney v. City & Cty. of Denver*, 534 F.3d 1269, 1274 (10th Cir. 2008) (quoting *Randle v. City of Aurora*, 69 F.3d 441, 447 (10th Cir. 1995)).

a causal connection between his discriminatory termination and the acts of the final policymaker over employment decisions—the superintendent. First, the individuals who allegedly unlawfully terminated Mr. Brooks' employment are not final policymakers for DPS. *See* Compl. ¶¶ 43–63. "[A] municipality can be liable under § 1983 for the acts of a municipal official only when the official possesses 'final policymaking authority' to establish municipal policy with respect to the acts in question." *Starett v. Wadley*, 876 F.2d 808, 818 (10th Cir. 1989). In deciding whether an official is a final policymaker, courts primarily look to three factors: (1) whether the officials' discretionary decisions are constrained by general policies, (2) whether the decisions are reviewable by others, and (3) whether the decisions were within the official's authority. *Dill v. City of Edmond, Okla.*, 155 F.3d 1193, 1211 (10th Cir. 1998). Whether an individual "possessed such 'final authority' is a question of state law." *Jantz v. Muci*, 976 F.2d 623, 631 (10th Cir. 1992).

All three factors favor a finding that Mr. Smith, Ms. Sahm-McKe, and the hearing officer are not final policymakers. First, these individuals were at least somewhat constrained by a DPS policy requiring them to hold hearings and determine whether there was a factual basis for the termination.[7] *See* Denver Public Schools Board of Education Policy GDQD-R (2015), http://www.boarddocs.com/co/dpsk12/Board.nsf/Public?open&id=policies#. Additionally, Mr.

---

[7] Mr. Brooks does not contest the Court's ability to consider DPS' policy. Morever, because the policy is publically available, the Court can take judicial notice of the policy and consider it at the motion to dismiss stage. *Tal v. Hogan*, 453 F.3d 1244, 1264 n.24 (10th Cir. 2006) ("Facts subject to a judicial notice may be considered in a Rule 12(b)(6) motion without converting the motion to dismiss into a motion for summary judgment. This allows the court to 'take judicial notice of its own files and records, as well as facts which are a matter of public record.'" (internal citations omitted) (quoting *Van Woudenberg ex rel. Foor v. Gibson*, 211 F.3d 560, 568 (10th Cir. 2000))); *Wasatch Equality v. Alta Ski Lifts Co.*, 820 F.3d 381, 388 n.5 (10th Cir. 2016) (holding that the district court permissibly took judicial notice of publically available budget information at the motion to dismiss stage).

Smith, Ms. Sahm-Mcke, and the hearing officer did not have non-reviewable authority over Mr. Brooks' termination. Colorado law grants school boards the exclusive authority to terminate personnel unless the board delegates its authority to another individual. Colo. Rev. Stat. § 22-32-110(1)(h). DPS' school board has adopted a policy assigning its authority to hire and fire classified employees, such as Mr. Brooks, to the superintendent. Denver Public Schools Board of Education Policy GDQD (2015), http://www.boarddocs.com/co/dpsk12/Board.nsf/Public?open&id=policies#. Although subordinates may hold hearings and make recommendations, the policy grants the superintendent the final authority as to termination decisions. *Id.* Therefore, Mr. Smith, Ms. Sahm-McKe, and the hearing officer are not final policymakers for employment decisions.

Relevant case law from the Tenth Circuit and this District supports the Court's holding. In *Jantz*, the Tenth Circuit found that the principal was not the final policymaker for employment decisions, because the school board retained the authority to review the principal's decisions. 976 F.2d at 631. Similarly, in *Singer v. Denver School District No. 1*, the court held that the principal did not have final policymaking authority, because the board of education retained the ability to change the principal's decision. 959 F. Supp. 1325, 1330 (D. Colo. 1997). Just as was true in *Jantz* and *Singer*, the individuals Mr. Brooks alleges committed the discriminatory termination did not have non-reviewable authority. As such, DPS cannot be held liable for their unconstitutional actions.

Second, Mr. Brooks does not allege any facts showing that the superintendent's final decision was discriminatory. "Because liability under section 1983 cannot rest upon the doctrine of *respondeat superior*, a direct causal link must exist between the acts of the governing body sought to be held liable and the alleged constitutional deprivation." *Ware v. Unified Sch. Dist. No. 492*, 902

F.2d 815, 819 (10th Cir. 1990) (internal citations omitted). "[A] causal connection between the unconstitutional act and the authorized decisionmakers may be established when the governing body has exercised its decisionmaking authority with deliberate indifference to the constitutional rights of those affected by its decisions." *Id.* In *Ware*, the Tenth Circuit found evidence that the school board acted with deliberate indifference to the plaintiff's constitutional rights, because it knew of the plaintiff's retaliation allegations, and it did not perform an independent investigation before approving the termination. *Id.* at 819–20. Here, in contrast, Mr. Brooks does not allege the superintendent had knowledge of Mr. Brooks' discriminatory complaints. Indeed, Mr. Brooks does not even mention the superintendent's final decision in his Complaint.[8] Because Mr. Brooks does not assert that the superintendent made the final termination decision with an improper motive or with deliberate indifference to his constitutional rights, Mr. Brooks fails to plead a municipal liability claim under §§ 1981 and 1983. *See Wulf*, 883 F.2d at 868–69 (stating that it is not anomalous "to hold a subordinate City official . . . liable for damages flowing from an unlawful termination which he lacked the authority to order, yet relieve the City and City Manager of liability because they, in contrast to the subordinate, did not act with the requisite impermissible motive").

II. **Third Cause of Action: Unlawful Retaliation in Violation of Title VII**

Mr. Brooks' third claim alleges DPS violated Title VII when it retaliated against him for his complaints that his termination was racially motivated. Compl. ¶¶ 78–81. Defendants argue the court should dismiss this claim, because Mr. Brooks does not allege a causal connection between

_____

[8] Mr. Brooks also does not allege that the superintendent ratified the alleged discriminatory basis for his termination. *See Wulf v. City of Wichita*, 883 F.2d 842, 868–69 (10th Cir. 1989) (holding that a municipality could not be liable under § 1983, because the final policymaker did not ratify the unlawful basis for his subordinate's decision, notwithstanding that the subordinate's recommendation may have been based on an impermissible motive).

his protected speech and the termination. Mot. to Dismiss 8–9.

Pursuant to Title VII, it is unlawful "for an employer to discriminate against any of his employees . . . because he has opposed any practice made an unlawful employment practice by [Title VII]." 42 U.S.C. § 2000e-3. "To prevail on a Title VII retaliation claim, a plaintiff must establish that retaliation played a part in the employment decision and may choose to satisfy this burden in two ways." *Fye v. Okla. Corp. Comm'n*, 516 F.3d 1217, 1224–25 (10th Cir. 2008). First, a plaintiff can rely on evidence that directly shows retaliation was a factor in the employment decision. *Id.* at 1225. This type of evidence includes "conduct or statements by persons involved in the decisionmaking process that may be viewed as directly reflecting the alleged [retaliatory] attitude." *Thomas v. Denny's Inc.*, 111 F.3d 1506, 1512 (10th Cir. 1997) (alterations in original) (quoting *Kenworthy v. Conoco, Inc.*, 979 F.2d 1462, 1471 n.5 (10th Cir. 1992)). If the plaintiff cannot present direct evidence, she can "prove her retaliation claim indirectly, invoking the *McDonnel Douglas* framework." *Fye*, 516 F.3d at 1227. Pursuant to *McDonnel Douglas*, a plaintiff must show: "(1) she engaged in protected opposition to Title VII discrimination; (2) she suffered an adverse employment action; and (3) there is a causal connection between the protected activity and the adverse employment action." *Meiners v. Univ. of Kan.*, 359 F.3d 1222, 1229 (10th Cir. 2004).

Mr. Brooks does not plead facts showing direct or circumstantial evidence of retaliation. First, Mr. Brooks does not allege any statements directly reflecting a retaliatory motive. Mr. Brooks contends Ms. Hurrieta's statement, "We don't know what you might do if you come back," constitutes direct evidence of retaliation. Resp. to Mot. to Dismiss 8. Additionally, Mr. Brooks claims Mr. Smith's instruction to him not to discuss the African-American Task Force directly shows a retaliatory motive. *Id.* at 9. The Court disagrees. Rather than suggesting that Defendants

terminated Mr. Brooks because of his disparate treatment complaints, the statements could arguably demonstrate a concern for Mr. Brooks' conduct in the workplace and a desire not to discuss matters related to the task force. *See Hall v. United States Dep't of Labor Admin. Review Bd.*, 476 F.3d 847, 856 (10th Cir. 2007) ("[S]tatements susceptible to two different interpretations—one discriminatory, the other not—is not direct evidence of illegal animus."). Furthermore, even if these statements suggest a discriminatory motive, as Mr. Brooks contends, they do not suggest a retaliatory motive—*i.e.* that Defendants terminated him because of his statements.

Second, Mr. Brooks does not allege sufficient facts to render his claim plausible under the *McDonnel Douglas* framework. *See Morman v. Campbell Cty. Mem'l Hosp.*, 632 F. App'x 927, 933–34 (10th Cir. 2015) ("In pleading a discrimination claim, [a plaintiff] need not set forth a prima facie case of discrimination. But she must allege facts that make such a claim at least plausible."). Although Mr. Brooks alleges he engaged in protected opposition to discrimination (complaining about DPS' differential treatment of African Americans) and that he suffered an adverse employment action (his termination), he does not plead any facts showing a plausible connection between the complaints and the termination. Importantly, the statements for which Mr. Brooks claims Defendants retaliated against him occurred after Defendants gave him a final termination notice. Mr. Brooks contends Defendants terminated him because of his statement during a December 15, 2016 meeting that Defendants were singling him out as a "stereotypical crass black man, held to a different standard than the non-African American attendees at the retreat." Compl. ¶¶ 46, 79. However, Defendants had given Mr. Brooks a final termination notice before he made this statement. Compl. ¶¶ 43–45. The United States Supreme Court has made clear that "[e]mployers need not suspend previously planned [conduct] upon discovering [an individual's

protected statements], and their proceeding along lines previously contemplated, though not yet definitively determined, is no evidence whatever of causality." *Clark Cty. Sch. Dist. v. Breeden*, 532 U.S. 268, 272 (2001).

Furthermore, even if Mr. Brooks contended that Defendants retaliated against him for his statements during a December 6, 2017 meeting, Mr. Brooks' allegations make clear that Defendants contemplated terminating him before this meeting. Prior to complaining of differential treatment during the December 6 meeting, Mr. Brooks stated that telling the leprechaun joke is not a "terminable offense." Compl. ¶ 38. Furthermore, Ms. Hurrieta's statement that she does not know what Mr. Brooks might do if he returns to work indicates that Defendants were at least contemplating his termination. It was not until after this discussion that Mr. Brooks complained of being treated differently from others at the retreat. *Id.* ¶¶ 39–41.

To be sure, that Defendants previously contemplated terminating Mr. Brooks is not dispositive of causation. *See Janczak v. Tusla Winch, Inc.*, 621 F. App'x 528, 532 (10th Cir. 2015) (stating that proceeding along lines previously contemplated does not negate other evidence on which a jury might base its conclusion that a termination was retaliatory). However, Mr. Brooks does not allege other facts indicating that Defendants terminated him because of his complaints. Moreover, this is not a case in which the previously contemplated conduct became more severe after the plaintiff engaged in protected activity. *See Foster v. Mountain Coal Co., LLC*, 830 F.3d 1178, 1192 (10th Cir. 2016) (concluding that summary judgment was improper when the employer terminated the plaintiff after he engaged in protective activity, notwithstanding that the employer previously contemplated suspending the employee). Therefore, Mr. Brooks fails to allege any facts supporting the notion that his discrimination complaints caused his termination. Accordingly, Mr.

Brooks' Title VII retaliation claim fails.

## III.    Fourth Cause of Action: Violation of the CADA

Mr. Brooks' fourth claim contends DPS violated the CADA when it terminated him because of his race.  Compl. ¶¶ 82–87.  The CADA prohibits discrimination or other unfair employment practices based on an individual's "disability, race, creed, color, sex, sexual orientation, religion, age, national origin, or ancestry . . . ."  Colo. Rev. Stat. § 24-34-402(1)(a).  Similar to Title VII, the CADA requires that a plaintiff exhaust the remedies available to him with the Colorado Civil Rights Division ("CCRD") prior to bringing suit.  Colo. Rev. Stat. § 24-34-402(1)(a).  A plaintiff exhausts administrative remedies under Colorado law when he receives a right-to-sue notice from the CCRD.  *See* Colo. Rev. Stat. § 24-34-306 (15) ("A notice of right to sue shall constitute final agency action and exhaustion of administrative remedies and proceedings pursuant to this part 3.").

Mr. Brooks does not allege in his Complaint or assert in his response that he filed a discrimination charge with the CCRD.[9]  Instead, Mr. Brooks argues that his charge with the EEOC exhausted his CADA claims.  Resp. to Mot. to Dismiss 12–13.  According to Mr. Brooks, because the EEOC and CCRD have a worksharing arrangement, he did not need to file a charge with both agencies.  *Id.* at 13.

The Court disagrees.  By its plain terms, the CADA requires a plaintiff to file a charge with

---

[9] Because failure to exhaust in this context deprives the district court of subject matter jurisdiction, a plaintiff must allege exhaustion in the complaint to establish the court's jurisdiction.  *See Richardson v. Fowler Envelope Co., LLC*, 288 F. Supp. 2d 1215, 1222 (D. Kan. 2003) ("Plaintiff does not allege that he filed charges of discrimination with either the EEOC or the Kansas Human Rights Commission.  Because plaintiff does not claim that he filed any such charges, he cannot meet his burden of pleading exhaustion of administrative remedies."); *see also United States, ex rel. Trujillo v. Grp. 4 Falck*, 244 F. App'x 853, 844–56 (10th Cir. 2007) (affirming the district court's dismissal of a complaint for failure to allege exhaustion).

the CCRD, not the CCRD or the EEOC. Colo. Rev. Stat. § 24-34-306(1)(a) (requiring a charge of discriminatory or unfair practices to be filed "with the division"). Furthermore, relevant precedent supports a finding that exhaustion with the EEOC does not satisfy a plaintiff's requirement to exhaust with the CCRD. In *Rodriguez v. Wet Ink, LLC*, the Tenth Circuit held that the worksharing arrangement between the CCRD and the EEOC does not permit one agency to issue notices of right to sue on the other agency's behalf. 603 F.3d 810, 813–15 (10th Cir. 2010). To exhaust claims under the CADA, a plaintiff must receive a notice of right to sue from the CCRD. *See* Colo. Rev. Stat. § 24-34-306 (15); *Matlock v. Denver Health & Hosp. Auth.*, No. 12-cv-03164-MSK-KMT, 2013 WL 3944127, at *1 (D. Colo. July 31, 2013) ("In order to assert claims under CADA in court, however, a plaintiff must first exhaust administrative remedies, which requires that the plaintiff receive a right-to-sue notice from the CCRD."). Because the EEOC could not issue a notice of right to sue for the CCRD, receiving a notice from the EEOC did not satisfy Mr. Brooks' state exhaustion requirement.

Additionally, in *Conlon v. City & County of Denver, Colorado*, the court rejected the argument that a plaintiff's complaint with the EEOC exhausted his administrative remedies with the CCRD. No. 11-cv-02039-RBJ-CBS, 2013 WL 143453, at *7 (D. Colo. Jan. 14, 2013); *see also Jeffers v. Denver Pub. Sch.*, No. 16-cv-02243-CMA-MJW, 2017 WL 2001632, at *8 (D. Colo. May 11, 2017) (dismissing a plaintiff's CADA claims, because "[w]hile Plaintiff received a right to sue from the Equal Employment Opportunity Commission, . . . she did not receive one from the Colorado Civil Rights Division . . . ."); *see generally Bankstorm v. Antlers Hilton Hotel*, No. 11-cv-01018-WYD-CBS, 2011 WL 6153024, at *4 (D. Colo. Nov. 3, 2011) ("Since a claim under CADA is a state claim, the Court need only consider the Right to Sue letter from the CCRD, the relevant

17

state agency. The Notice of Right to Sue from the EEOC is irrelevant in this analysis because it only goes to federal claims.").

Mr. Brooks relies on *Love v. Pullman Co.*, 404 U.S. 522 (1972) to support his argument. Resp. to Mot. to Dismiss 12–13. However, this case is inapposite, as it dealt only with time limits for exhaustion. *Love*, 404 U.S. at 526–27 (holding that the EEOC complied with its obligation to timely file a case when it permitted the state agency to take action before formally filing a claim). Indeed, the plaintiff in *Love* did not assert any state law claims, and the Court was not tasked with deciding whether the plaintiff exhausted his claims with the state agency. As such, *Love* is not relevant to the Court's present analysis.

In sum, Mr. Brooks fails to demonstrate that he exhausted the remedies for his state law claim with the CCRD. As such, the Court recommends dismissing Mr. Brooks' fourth claim for relief without prejudice.

## IV.     Fifth Cause of Action: First Amendment Retaliation

Mr. Brooks' next claim asserts DPS, Smith, and the Carson Defendants retaliated against him in violation of the First Amendment. Compl. ¶¶ 88–97. Defendants contend Mr. Brooks fails to plead facts showing he engaged in protected activity. Mot. to Dismiss 9–10. Although Mr. Brooks' Complaint does not identify the protected speech on which he bases his First Amendment claim, Mr. Brooks states in his response that "the Plaintiff's actions in the 'Leprechaun joke' are the speech at issue in Plaintiff's First Amendment Complaints." Resp. to Mot. to Dismiss 13. Mr. Brooks then argues "[t]his speech and conduct was protected in accordance with the usual practices and policies of Defendant District and has been utilized in prior District Retreats." *Id.*

To determine whether Defendants made an impermissible hiring decision, the Court must

apply the four-step test articulated in *Pickering v. Board of Education of Township High School District*, 391 U.S. 563 (1968). *Worrell v. Henry*, 219 F.3d 1197, 1207 (10th Cir. 2000) ("This circuit has applied the *Pickering* balancing to hiring decisions.").

> The first three steps of the Pickering test are (1) whether the speech touches on a matter of public concern, (2) whether the employee's interest in commenting on matters of public concern outweighs the interest of the state in promoting the efficiency of the public service it performs through its employees, and (3) whether the protected speech was a substantial or motivating factor behind the adverse employment decision. If these three factors are met, (4) the burden shifts to the employer to establish that it would have reached the same decision in the absence of the protected conduct.

*Burns v. Bd. of Cty. Comm'rs of Jackson Cty.*, 330 F.3d 1275, 1285 n.7 (10th Cir. 2003). Accordingly, to assert a First Amendment retaliation claim, a public employee must first demonstrate that his speech involved a matter of public concern. *Deschenie v. Bd. of Ed. of Cent. Consol. Sch. Dist. No. 22*, 473 F.3d 1271, 1276 (10th Cir. 2007). Speech is of public concern when it relates to "a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public at the time of publication." *City of San Diego, Cal. v. Roe*, 543 U.S. 77, 83–84 (2004).

Here, the Court recommends holding that Mr. Brooks does not state a First Amendment retaliation claim, because his alleged speech is not of public concern. Although Mr. Brooks does not provide the content of the leprechaun joke, he pleads in his Complaint that the joke is inappropriate and graphic. Compl. ¶¶ 29–31. "Nonpolitical joking remarks are not given First Amendment protection." *Thayer v. City of Holton*, 515 F. Supp. 2d 1198, 1207 (D. Kan. 2007); *Lautermilch v. Findlay City Sch.*, 314 F.3d 271, 273–76 (6th Cir. 2003) (holding that a substitute teacher's inappropriate jokes were not a matter of public concern giving rise to First Amendment protection); *see generally Waters v. Churchill*, 511 U.S. 661, 672 (1994) ("[W]e have never

expressed doubt that a government employer may bar its employees from using . . . [an] offensive utterance to members of the public or to the people with whom they work."). Because Mr. Brooks does not allege he spoke on a matter of public concern, he fails to state a First Amendment retaliation claim.

## V.    Sixth Cause of Action: Equal Protection Violation

Mr. Brooks' sixth cause of action asserts of violation of the Equal Protection Clause. Compl. ¶¶ 98–107. Mr. Brooks appears to allege Defendants treated him differently from similarly situated employees by terminating him and retaliating against him for his speech. *Id.* Defendants first contend Mr. Brooks cannot assert an equal protection retaliation claim. Mot. to Dismiss 12–13. Additionally, Defendants argue Mr. Brooks fails to assert an entity liability claim against DPS, and they contend the Carson Defendants are entitled to qualified immunity.[10] *Id.* at 13–14.

The Equal Protection Clause "prohibits state and local governments from treating similarly situated persons differently." *Rector v. City & Cty. of Denver*, 348 F.3d 935, 949 (10th Cir. 2003). "The prima-facie case required to support a claim of intentional discrimination under the Equal Protection Clause varies based on the context and nature of the facts." *Morman*, 632 F. App'x at 934. However, "[u]nder any standard, to prevail on an equal-protection claim, [a plaintiff] would need to show that she was treated differently than similarly situated employees . . . ." *Id.* Additionally, when a plaintiff asserts an equal protection claim against a municipality, she must also show that the defendant had a policy or custom of treating similarly situated individuals differently. *See Watson v. City of Kansas City, Kan.*, 857 F.2d 690, 694 (10th Cir. 1988) (stating that for the

---

[10] Defendants do not seek dismissal of Mr. Brooks' equal protection claim against Mr. Smith. Reply in Supp. of Mot. to Dismiss 8 n.1, ECF No. 27.

plaintiff to survive summary judgment on her equal protection claim, she must show "that it is the policy or custom of the defendants to provide less police protection to victims of domestic assault than to other assault victims"); *Bryson*, 627 F.3d at 788 (stating that a plaintiff must establish a policy or custom to assert a constitutional violation against a municipality). To withstand a motion to dismiss an equal protection claim against a public employee who has asserted a qualified immunity defense, the plaintiff must demonstrate that the differential treatment violated clearly established law. *Woodward v. City of Worland*, 977 F.2d 1392, 1396 (10th Cir. 1992) (holding that the district court erred in denying individual defendants qualified immunity on the plaintiff's equal protection claim, because the defendants' actions did not violate clearly established law).

Here, the Court recommends holding that Mr. Brooks fails to state an equal protection claim against DPS and the Carson Defendants. As an initial matter, the Court recommends dismissing Mr. Brooks' claim to the extent it asserts a retaliation cause of action. Mr. Brooks does not contest this argument in his response, and the Tenth Circuit has noted that the Equal Protection Clause is not a proper vehicle for retaliation claims. *Teigen v. Renfrow*, 511 F.3d 1072, 1086 (10th Cir. 2007) ("The kind of bare retaliation claim at issue in this case simply cannot form the basis for a constitutional equal protection violation.").

Next, the Court recommends dismissing Mr. Brooks' claim as to DPS. As previously stated, to plead an equal protection claim against DPS, Mr. Brooks must allege DPS had a policy or custom of treating similarly situated employees differently. *See Watson*, 857 F.2d at 694. Mr. Brooks does not satisfy his burden. Indeed, Mr. Brooks does not identify any other individuals who DPS treated differently because of their protected status. In a separate section of his brief, Mr. Brooks contends DPS had a policy of permitting employees to participate in inappropriate games and other frivolous

behavior at the retreat. Resp. to Mot. to Dismiss 7–8. However, a widespread practice of allowing employees to play obscene games is not a policy of treating similarly situated employees differently. Because Mr. Brooks fails to assert a policy or custom that caused his constitutional injury, he does not allege an equal protection claim against DPS.

The Court also recommends finding that Mr. Brooks fails to assert an equal protection claim against the Carson Defendants, because Mr. Brooks has not met his burden of overcoming qualified immunity.[11] Under the doctrine of qualified immunity, government employees "generally are shielded from liability for civil damages insofar as their conduct does not violate 'clearly established' statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Unlike other affirmative defenses, after a defendant raises a qualified immunity defense, "the burden shifts to the plaintiff to show the defendant is not entitled to immunity." *Roska ex rel. Roska v. Sneddon*, 437 F.3d 964, 971 (10th Cir. 2006). If the plaintiff fails to show the violation was clearly established, the court must dismiss the plaintiff's claim. *See, e.g.*, *Gross v. Pirtle*, 245 F.3d 1151, 1156 (10th Cir. 2001).

Here, Mr. Brooks contends the Carson Defendants treated him differently by complaining about his conduct, while not reporting the inappropriate actions of non-minorities at the retreat. Compl. ¶ 47; Resp. to Mot. to Dismiss 18. Defendants assert they are entitled to qualified immunity, because Supreme Court and Tenth Circuit precedent does not clearly establish that it violates the constitutional to complain to supervisors about an employee's inappropriate joke, while not

---

[11] As stated in the factual background section, the Carson Defendants include Ms. Larkin, Ms. Holmes, Ms. Kouzmanoff-Vymyslicky, Ms. Goers, and Ms. Jacobsen. These individuals worked at Carson Elementary School and allegedly reported Mr. Brooks' conduct to his supervisors. Compl. ¶ 34.

complaining about individuals who played an indecent game. Mot. to Dismiss 13. The Court agrees with Defendants. Importantly, Mr. Brooks cites no cases to rebut Defendants' argument. Therefore, Mr. Brooks fails to meet his burden of showing the violation was clearly established, and the Court recommends dismissing Mr. Brooks claim as to the Carson Defendants.[12]

## VI. Seventh Cause of Action: Civil Conspiracy

Mr. Brooks' final claim alleges Mr. Smith and the Carson Defendants engaged in a conspiracy to unlawfully terminate Mr. Brooks. Compl. ¶¶ 108–13. The Court finds that Mr. Brooks fails to state a claim. To assert a civil conspiracy claim under Colorado law, a plaintiff must allege: "(1) two or more persons . . . ; (2) an object to be accomplished; (3) a meeting of the minds on the object or course of action; (4) one or more unlawful overt acts; and (5) damages as the proximate result thereof." *Jet Courier Serv., Inc. v. Mulei*, 771 P.2d 486, 502 (Colo. 1989).

Mr. Brooks fails to allege facts establishing the third element—that Defendants came to an agreement to unlawfully terminate him. Mr. Brooks alleges that "these Defendants agreed by words or conduct to accomplish the illegal and discriminatory goal of maliciously, willfully, and intentionally causing Plaintiff's discriminatory termination . . . ." Compl. ¶ 109. However, the Court cannot consider this type of conclusory allegation in determining whether Mr. Brooks states a claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 678–79 (2009). Regarding only Mr. Brooks' factual non-

---

[12] Because Mr. Brooks bears the burden of overcoming qualified immunity, Mr. Brooks' failure to cite to any cases clearly establishing that the Carson Defendants' conduct violated the Equal Protection Clause is sufficient to require dismissal of his claim. *See Gutierrez v. Cobos*, 841 F.3d 895, 900 (10th Cir. 2016) (stating that a plaintiff's failure to meet his burden of overcoming qualified immunity requires dismissal of the plaintiff's claim). However, the Court's independent research also revealed no cases clearly establishing that it violates the Equal Protection Clause to accuse a minority of telling a graphic joke, while not reporting non-minorities who played an inappropriate game.

conclusory allegations, Mr. Brooks does not even assert the Carson Defendants met with Mr. Smith, let alone agreed to terminate him. Based on the allegations in the Complaint, the Carson Defendants simply heard an offensive joke and decided to report it to Mr. Wein and Ms. Hurrieta—individuals not implicated in Mr. Brooks' alleged conspiracy . *See* Compl. ¶¶ 30–37. Mr. Brooks does not allege that the Carson Defendants and Mr. Smith decided together that they would work toward unlawfully terminating Mr. Brooks. Accordingly, the Court recommends dismissing Mr. Brooks' final claim for relief.

## CONCLUSION

In sum, the Court recommends dismissing Mr. Brooks' Complaint, except his Title VII claim against DPS and his equal protection claim against Mr. Smith. Specifically, the Court finds that Mr. Brooks' § 1981 violation fails to allege DPS acted pursuant to a policy or custom. Next, the Court concludes that Mr. Brooks' third claim does not plausibly plead a causal connection between his protected statements and his termination. The Court also recommends dismissing Mr. Brooks' fourth claim without prejudice for failure to exhaust administrative remedies. Regarding Mr. Brooks' fifth claim, the Court finds Mr. Brooks does not allege he spoke on a matter of public concern. The Court then finds that Mr. Brooks fails to assert a municipal policy or custom underlying his equal protection claim. Additionally, Mr. Brooks does not meet his burden of demonstrating that the Carson Defendants violated clearly established law. Finally, the Court recommends dismissing Mr. Brooks' civil conspiracy claim for failure to allege an unlawful agreement. Accordingly, the Court respectfully recommends that Defendants' Partial Motion to

Dismiss Complaint [filed September 12, 2017; ECF No. 18] be **granted**.[13]

Entered and dated at Denver, Colorado, this 16th day of November, 2017.

BY THE COURT:

*Michael E. Hegarty*

Michael E. Hegarty
United States Magistrate Judge

---

[13] Be advised that all parties shall have fourteen days after service hereof to serve and file any written objections in order to obtain reconsideration by the District Judge to whom this case is assigned. Fed. R. Civ. P. 72. The party filing objections must specifically identify those findings or recommendations to which the objections are being made. The District Court need not consider frivolous, conclusive or general objections. A party's failure to file such written objections to proposed findings and recommendations contained in this report may bar the party from a *de novo* determination by the District Judge of the proposed findings and recommendations. *United States v. Raddatz*, 447 U.S. 667, 676–83 (1980); 28 U.S.C. § 636(b)(1). Additionally, the failure to file written objections to the proposed findings and recommendations within fourteen days after being served with a copy may bar the aggrieved party from appealing the factual and legal findings of the Magistrate Judge that are accepted or adopted by the District Court. *Duffield v. Jackson*, 545 F.3d 1234, 1237 (10th Cir. 2008) (quoting *Moore v. United States*, 950 F.2d 656, 659 (10th Cir. 1991)).